Good morning, your honors. Good morning. I'm Lynda Webb. I'm here for Mr. Lockard. I'm here to ask for the remand for resentencing on his case. We're here because of the enhancements. Three of the enhancements were given to Mr. Lockard. I believe those are at the District Court of Abuse's discretion. The first is the tenth victim, which is Mr. Nunes, who was one of those who entered into an ARM financing in order to obtain three duplexes. Wasn't that foreseeable, given the nature of this whole fraud? I think any time anybody enters into an ARM, it's foreseeable that the credit market might go down and your rate might go up. And I think it's built into it. And so to take that... But isn't that enough in terms of sentencing? I don't think it should be enough, especially within Mr. Nunes' case. Mr. Nunes, I don't think, was such an innocent victim here. He received a $22,000 cash back. He also signed documents that misrepresented his income. I know that the District Court said that he was unsophisticated, but I think the thing is Mr. Nunes had bought a house before through Mr. Murray, so he certainly knew that you weren't supposed to be getting cashbacks. He certainly was aware that ARMs caused a lot of risk, had a lot of risk with them. And he had the interpretations of the applications were through his brother-in-law, who spoke perfect English as well as the Spanish. So it wasn't like he didn't know what he was doing. So that's only... At the end of the day, what happened to him? At the end of the day, well, he also put people into those duplexes that could not make the payments. And so what he was doing was basically under... how do I want to put it? The rents were under what they could have been. And then once the ARM mortgages went up, the interest rates went up, then he couldn't find anybody to put into those. And he was taking people that were subsidized. They were getting rent subsidies. And you know that that's not going to mean anything. The real thing is why he would go into this to begin with and to buy three of them when he knows that he's only making about $32,000 to $35,000 a year as a janitor. I don't think that he is innocent. I think he certainly knew about that. He knew what he was making. He knew he was filling out applications that misrepresented his income. Isn't that, though, the district court didn't see it that way? I know. They saw him as a victim. Yes. And he said that he was unsophisticated. He barely spoke English, was sold an overvalued piece of property, and that he didn't know that he was going to wind up... that there was a big risk that he was going to wind up losing. And I guess we have... you have a pretty high burden to show that... Well, I think one of the things is that he didn't... Mr. Nunes really didn't even show any evidence of any losses. I mean, his brother-in-law drew up a paper, and that was not allowed even at the sentencing because the brother-in-law was not there to speak. And he drew up a paper that was going to have the losses on him, so nothing as far as a real number of losses was ever presented to the court at all. Well, but the issue isn't amount of loss. It's whether or not he's a victim. I mean, you're not contending that he made money on this deal. But isn't the only way he could be a victim is because he basically had a loss in the long run. He had the loss through the ARM. He had a loss because of the inflated price. He's supposed to be unsophisticated, but I'm not so sure that's really true. I mean, he certainly had someone to interpret for him, and he certainly had bought property before. And he received $22,000 back. I think it's interesting, the $22,000 cash back that he received, sort of he took the money, but that never seemed to be factored in, looking at him as a victim. Sort of like a pyramid scheme or a Ponzi scheme where a lot of people in the middle really should know better, but they're hoping it's going to work out for them. When it doesn't, don't we still hold the first person who started the whole thing responsible for the whole mess? Well, for the Ponzi schemes, yeah, but I think the thing is here that putting your money in a Ponzi scheme doesn't necessarily mean that you're going to get money back. You're hoping you're going to get money back, but it doesn't necessarily mean that you've done a lot of other false representations or that you actually had some real knowledge because you've already done deals that were legal deals, and now you know that you shouldn't be in this thing or anybody who sort of takes this risk. How is it that because you become a victim because you're willing to take a risk that you shouldn't be taking? Well, you may become a victim because someone's taken advantage of your willingness to take a risk. I mean, I look at this and I find it very difficult to see how Nunez ever comes out ahead unless there's some enormous appreciation that saves everybody. He's got these arms that are bound to jump up. You're not going to be able to find tenets once the arms jump up. It seems to me that his end fate is nearly inevitable. Inevitable. And so, yeah, he may have had avarice in his heart, but if it's a game that he can't win, I mean, most people go to Vegas thinking they're going to win. They don't. He may have thought he was going to win, but he wasn't. The difference in going to Vegas is you can enjoy it while you're there. And you might be able to win. Who knows? Well, son, speak for yourself. But, really, I look at this and I have a hard time seeing how he could have come out of anything ahead of the game given the reality of the ARMs jumping up. Well, I know that he could have refinanced or he could have tried to refinance. My understanding from the record is that the banks wouldn't allow him to refinance, and that's not much different than what was going on all over the country at this time. That might be the problem, because if accurate information had been given in the first place, he probably wouldn't have gotten the first financing. That's right. And so when he doesn't have somebody there running interference for him, he can't refinance. He doesn't have an economically viable situation. Now, it may well be true. I understand that he had a degree of avarice in his heart to be led in the first step, but he's led down a path that he plainly doesn't understand because it's a loser's path. That seems to make him a victim. I understand where you're coming from, but it seems to me given the stand that we have reviewing the factual finding by the district court, can we say it's clearly erroneous to characterize him as a victim? Well, like I said, when you get $22,000 out of the deal, when you know about the ARMs and there's a risk that you're willing to take, I don't think that you can literally say that you're a victim. It's not like as if he's riding in the backseat of the car and I drove the car into the wall, and it's my fault because I've done that. I mean, he was involved in this. I think the problem for me is that he was taking a much bigger risk than under the way that the district court analyzed his situation factually, he could have comprehended. And that's my problem with it. Is there something that you want to add to help me out? Well, the only thing I can think of is that the U.S. versus OLA's case, which says that credit market failures are not necessarily due, can't be attributed to fraudulent schemes. And I think that's exactly what applies here, that Mr. Lockhart is not in control of the credit markets, and the credit market was falling at the very same time that this was all going on. And so to say that he's responsible for credit markets going down, I just can't see that. Thank you. Well, I think if you want to reserve some time, we'll have the government respond to that. Yes. Thank you. Good morning, Your Honors. May it please the Court. My name is Kevin Feldes, and I represent the United States in this matter. To respond directly to the argument about 10 or more victims, the district court found that Mr. Nunez was a victim. And I think what it's important to focus on here is, and what wasn't mentioned a moment ago, is that the fraud that Mr. Lockhart perpetrated. Mr. Nunez testified that he would never, as nobody would, have purchased these units if he knew what the actual price and value was. And what we're talking about here is a difference between $60,000, $70,000, $80,000 that he paid over what the fair market value was. And so Mr. Nunez was doomed to fail. And, in fact, this was Mr. Lockhart's scheme. His scheme was to have falsely inflated appraisals to support selling these units for far more than they were worth. The district court also found that Mr. Nunez was very unsophisticated, and he testified. He did not even seek to challenge to negotiate this price. He did not, as many people might in the real estate market, negotiate down $5,000, $10,000. He didn't do that. He trusted the people who were selling this property. What's also interesting to note is that Mr. Murray, his real estate agent, was a co-conspirator of Mr. Lockhart and was really in on this. So Mr. Nunez was doomed to fail. The guidelines define victim as any person who sustains any loss. And, of course, in this case, the loss was very foreseeable. What about the $22,000 that Ms. Webb tells us about? Right. Well, it's true. And Mr. Nunez testified that he received this money back at closing, which he immediately put into fixing up these duplexes. He didn't know what he was doing was wrong. He was unsophisticated. And he spent that money right away to get these properties even up. He thought he had a viable investment. Right. And he struggled. This is a man who tried to keep these properties as long as he could, and he put his own savings into them. So in terms of actual loss, he suffered actual loss. The properties were foreclosed. And he put in not only did he not make the rent to cover the mortgage, but he put in thousands of dollars of his own savings. The district court seemed to have been troubled by the fact that there were lots of other victims, individual victims here, and he was selected as the victim and just why that was. Can you explain why this, other than the fact that they needed a tenth victim? Right. And I was counsel below, Your Honor. We had nine institutions that there was no question about, and then there were a number of individuals who the government believed were victims, and we presented Mr. Nunez as that representative victim during the course of what was a three-day session. Was he presented as a representative victim? Yes, Your Honor. Yes, Your Honor. If there's no other questions on that point, I will turn to the point of more than a million in gross receipts, which is the enhancement that the district court applied under 2B1.1B14A. And I think I would just highlight there that government's exhibit number 12, which was the basis of this enhancement sentencing, shows that Mr. Lockard was the actual borrower on about $993,000 worth of loans from the financial institution at issue. And that's First National Bank of Alaska, because that's what we're talking about here. We're limited to financial institutions. So they're all the FNBA loans. And the chart, exhibit 11, which is that SCR number, page 39, that chart shows that Mr. Lockard was the actual buyer and borrower on $993,000. So now we're talking about $7,000 more that the government had to show. And Emerald Way and Lewis Parkway, two of the properties listed on that chart, show loans of another $600,000. Now, Mr. Lockard controlled this enterprise, and, in fact, Mr. Ruff and Mr. Paterno were simply nominees. So, in fact, the gross receipts were all going to Mr. Lockard. But even if we accept the defendant's argument, which they put forth in their brief, which is that, well, Mr. Lockard was in a partnership, so we should only attribute 50% to him, not the full amount of those loans, we are well over the $1 million. So even if we take 50% of those other two properties that were loaned in the names of Ruff and Paterno, we're well over that amount. And I think it's interesting and demonstrative of this scheme to look at the Lewis property, which is the last one in Exhibit 12. Mr. Lockard admitted, and it's in the plea agreement, because Mr. Lockard admitted the factual basis of the plea agreement even when he withdrew from that agreement. So in the plea agreement, looking at supplemental excerpts of record, pages 22 and 23, it describes Lewis Parkway. Mr. Lockard arranged for a nominee purchaser to purchase that property for $50,000. This is page 22 of the supplemental excerpts, for $50,000. And that actually was a relative of his. Then Lockard arranged for that nominee to resell the property to Mr. Paterno for $550,000 on the very same day. And we introduced at sentencing the records from the recorder's office that shows that it transferred the same day for $550,000. This allowed Lockard to pay the original $50,000 purchase price and still have $250,000 in fraudulently obtained loan funds at his disposal. That's what he admitted to, at his disposal. So we see there he's acknowledged that that money was coming for his use. On the question of the 10th victim, the appellant has argued and cited in her brief the Ollis case from the Fifth Circuit that says the changes in the credit market are not attributable to fraud by themselves. Do you want to comment on that? Because I noted that you didn't cite it in your brief. The Ollis case, I think, is not really applicable here. Those are talking about securities fraud cases more than they are real estate fraud cases. And I think the Crandall case from the Ninth Circuit, which we did cite, is more apropos here. And that case specifically talks about the fact that defendants should not benefit from ups or downs in the real estate market. And they say the actual loss to the victims at the time of the fraud as opposed to at the time of sentencing. So we're not going to let them get a benefit from the market rising or take a hit from the market going down. And in this case, the 10th victim was the fraud at the time he purchased that property. Mr. Nunez paid $60,000, $70,000 over market value. So right there we have actual harm to him. And then by the time of sentencing, these properties had been foreclosed. They say the harm was not just in the change in the credit market. This is not the type of harm or loss, because we're talking about loss more than harm here, that is attributable to a change in the market. It was attributable to the fraud that was perpetrated on Mr. Lockhart. Are there no other questions? Thank you. Thank you. Another enhancement I'd like to speak to is the leader-organizer. The district court found that Mr. Lockhart had the highest IQ. There was no evidence presented that he had the highest IQ. Also that he was more culpable and had a central role. However, under AVEA, those are not the standards to determine whether he's a leader-organizer. And he mentioned Mr. Paterna as being led by Mr. Lockhart. The problem with that is that the district court's finding is exactly opposite of what Mr. Paterna testified to. From excerpts, the appellant's excerpts from 206 to 234, Mr. Paterna said Mr. Lockhart was not in control of him. He made his own decisions. He was not forced to enter any of the fraudulent transactions. That he's the one that made the directions of how the money was going to be used and where it was going to be used. That he actually had legal counsel in the first ten duplexes that he went into. And that he made his own decisions. And I don't see how then that Mr. or how the district court could find that he was basically led and that Mr. Lockhart somehow led him down the rosy path when Mr. Paterna's testimony doesn't support that at all. And Ms. Stroud and Mr. Carlson, Ms. Stroud being someone who worked for one of the title companies and Mr. Carlson being the appraiser, neither one of those were relatives. As far as I know, they didn't owe him any money. And they did not work for him. So why he would be leading and organizing or having any authority of him, which is the key, I don't see there's any authority that Mr. Lockhart would have over them. They did not work for him. Thank you. Thank you.
judges: Schroeder, O'scannlain, Clifton